*With the Name of Allah, the Most Gracious, the Most Merciful*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

Regina M. Hunter El )
                           )
             *Petitioner(s)* )        C/A No.
                           )
       v.                    )
                           )       **COMPLAINT**
U.S. Department of Veterans Affairs )    **(Anti-Dumping Statute**
Prisma Health Tuomey Hospital )      **42 U.S.C. §1395 dd)**
                           )
            *Respondents(s)* )

RCV'D – USDC COLA SC
APR 25 '25 PM 4:34

## COMPLAINT

NOW COMES, the Petitioner with her complaint of multiple violations of the Anti-Dumping Statute by two hospitals.  On Wednesday 9 April 2025, the U.S. Department of Veterans Affairs William Jennings Bryan Dorn Veterans Affairs Medical Center Emergency Department ('VA Dorn ED') did violate the federal patient *'Anti-Dumping Statute'* also known as *"Emergency Medical Treatment and Active Labor Act"* or "EMTALA" (Social Security Act, § 1867; 42 U.S.C. § 1395dd) when they failed to stabilize Elijah Hunter ('Elijah') but instead discharged him home without appropriate screening and treatment for Alzheimer's disease or dementia.  Similarly, on 10 Apil and 14 April 2025 Prisma Health Tuomey Hospital Emergency Department ('Tuomey ED') did knowingly violate the Anti-Dumping Statute when it failed to properly screen, treat, and transfer Elijah to a facility to handle his mental conditions.

**Duty to Examine and Treat Emergency Medical Condition Not Met**

1. Pursuant to 42 U.S.C. §1395dd, Elijah, the Petitioner's 93 year old cousin, was not properly screened for Dementia although he was exhibiting clear signs of cognitive impairment.  It was clear to the Petitioner that the VA Dorn ED should have tested Elijah for Alzheimer's

disease or different types of dementia because he was repeating the same phrases and asking the same questions repeatedly, agitated and hallucinating. His signs of cognitive decline were apparent from his speech and conduct. Elijah often could not remember or recall what information was just stated a few moments ago. His memory loss or forgetfulness is not isolated but an ongoing pattern. After his Urology appointment, earlier that same day, Elijah had a lengthy conversation with HUD VASH (VA Supportive Housing). Elijah was told there were no residences for veterans at the VA Dorn campus and that he did not qualify for a veteran bed in a temporary shelter because he would have to leave the shelter at 7:30 a.m. each morning, and navigate on his own. Then the Petitioner took Elijah to the VA Dorn ED and requested he be placed on a 30 day psychiatric hold. Apparently, Elijah's judgment was impaired. He told the Petitioner he would get a small heater now that the weather was warmer so he could reside in their grandmother's dilapidated, inhabitable structure with no running water and electricity (see photos). In accord with 42 U.S.C. Sec. 1395dd(a) the ED should have provided the appropriate medical screening examination for Alzheimer's or dementia or used ancillary services available to the VA Dorn ED, but an objective examination was not conducted.

**What emergency medical condition existed?**

2. Pursuant to 42 U.S.C. Sec. 1395dd(e)(1)(A)(i)), an emergency medical condition means "*a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably to expected to result in placing the health of the individual…in serious jeopardy.*"

3. Here, at VA Dorn ED, Elijah's emergency medical condition included hallucinations, delusions, anxiety, conflicting thoughts, and aggressive language and behavior. Elijah told medical staff he did NOT want to return home which created a self-inflicted urgent housing crisis–**Where would he sleep that night?** The Defendants may posit this matter as a housing crisis only which neither party was able to expedite, but the Petitioner holds that the core issue is Elijah's mental health crisis.

4. A crisis that began on 8 April 2025 with VA Dorn ED and continuing at Tuomey ED on 14 April 2025. Elijah was dumped three times within a seven day period.

**Medical Screening Requirement Not Met at VA Dorn ED**

5. The VA Dorn ED staff did not meet the medical screening requirement nor access ancillary services available to the ED to determine whether an emergency medical condition existed. It's unlikely that the emergency department drew blood work or performed a CT scan on his brain. It's important for Elijah to have these assessments and take necessary medications to slow the progression of any cognitive decline. The VA Dorn's ED failure to properly screen Elijah and provide ancillary services routinely available to the ED has endangered his well-being and violated the Anti-Dumping Statute. The ED did not make the safety of the patient a priority even though he was showing signs of cognitive decline but rather discharged him home to family members not qualified to treat his mental health conditions,

6. Prior to his visit to the ED, that same hour, during his conversation with the HUD VASH PACT Social Worker ('Amanda')–: Elijah showed anxiety and depression. While waiting to be seen by the HUD VASH team about housing options Elijah inappropriately asked the Petitioner whether she wanted to marry him. The Petitioner told him no! They are cousins and family. The Petitioner believes Elijah is afraid of being placed in an assisted living

facility or group home. Yet, the Petitioner believes Elijah cannot live independently and requires supervised care. Elijah recently learned he loss all vision in hsi left eye due to glaucoma and was overheard saying he was to meet another women before he goes blind in his right eye.. Elijah may be afraid of being alone and unable to care for himself.

7. Thus, the loss of vision in his left eye due to glaucoma whereby glasses would provide no remedy may be one cause of his anxiety and/or depression. On or about February 2025, the Petitioner took Elijah to the VA Dorn ER because he reported he could not see out his left eye while at the public library. The Petitioner learned that Elijah had cataract surgery, three years ago, in February 2022 and was prescribed eyeglasses but never filled the prescription. This shows that Elijah neglected his own health then and his vision deteriorated.. Elijah has an upcoming appointment at VA Dorn Ophthalmology om **7 May 2025** to help preserve the vision in his the right eye. The VA Dorn should arrange transport to ensure Elijah maintains this critical appointment.

8. In addition, prior to visiting VA Dorn ED, the day prior, on 8 April 2025, complained he no longer wanted to be in the family home. He wanted to go to VA Dorn in Columbia. Since the home health aide cannot travel to Columbia, SC, as it is outside her work zone; the Petitioner took Elijah to meet with his local social worker, Elijah told his local PACT Social Worker (William 'Liam' Flegal) that he no longer wanted to reside in the Petitioner's mother's home. He complained of feeling shut-in, claustrophobic, proselytized to or that the Petitioner's mother's faith does not allow persons who do not practice their faith in the same home. Elijah told Mr. Flegal he did NOT want to remain at home but wanted Flegal's assistance with alternate housing. Here, Elijah position is unfounded. He lived in the family home for over 18 months without any pressure to convert to either Christianity or Islam.

Elijah told his PACT Social Worker, William Flegal he was atheist that he did not believe in God and was himself a God. Elijah also explained to Mr. Flegal that Black River Electric Cooperative would not reconnect his power. Also Elijah was frustrated with Black River Electric Cooperative's new guidelines-- mainly that he 1) obtain a mobile home license; 2) demolition permit; 3) have the new structure in position to enable the engineer to run the power lines; 4) obtain an order of determination of heirs from the Probate Court; and 5) obtain the notarized signature of each adult heir giving permission to establish an electrical account.

9. Mr. Flegal located Elijah emergency shelter at Sumter United Ministries, 36 S. Artillery Drive, Sumter, SC 29150. Elijah's home health aide agreed to take him there before her shift ended. A short time later, Mr Flegal shifted his outlook and felt that Elijah should not stay at the shelter because he was not independent and if the Petitioner left him to handle his own affairs it would be considered elder abandonment—a desertion of the individual the Petitioner assumed care of.

10. Elijah had an outburst of emotions in the clinic lobby. Elijah expressed anger and agitation about the housing solution Mr. Flegal found him. He began shouting at the Petitioner that he 'never wanted to see her again'. The Petitioner did not understand the reason for his aggressive speech. Denise Richardson, a nurse at the clinic told Elijah they could not provide his transport to VA Dorn Columbia, but advised he could go to Prisma Tuomey for further assistance. The Petitioner drove him there because his home health aide's duty ended at 1:30 p.m.

11. The next day at HUD VASH Elijah again showed delusion and aggressive conduct by repeatedly asserting that he owned 21 acres with his sister only and would put the Petitioner

off his land gesturing towards the Petitioner. Elijah repeated this more than five times in his conversation with Amanda. It is a fact that family farm is heir property owned by the Heirs of Sarah B. Hunter (d.).

12. Sadly, Elijah lost his interest in the land when his former Power of Attorney made a fraudulent '*Deed of Assignment and Transfer of Rights*' on 20 September 2021. The Sumter County Register of Deeds will not remove the deed from the public record without a judge's order. He is currently in the Sumter County Circuit Court to have the act declared null and void and for his former paramour and POA ejected from the property. Elijah is upset the Petitioner resides on the farm with a gas-powered generator. However, Elijah cannot reside in the same dwelling with the Petitioner nor have home health services there because the VA does consider a generator a reliable source of power for his grooming hygiene and bathing needs.

**Refusal of Home Health Services & Denial of COPD**

13. Prior to going down to the VA Dorn ED, Elijah also told Amanda he did not need home health services he could bathe and wash himself. The ED physicians also felt Elijah had decision making capacity. However, the Petitioner disagrees with this finding and believes Elijah needs supervised care around the clock. Prior to these events, the Petitioner asked the VA Dorn home health coordinator to increase his hours. However, because there's no finding of incapacitation or court ordered guardianship, Elijah is free to make his own decisions even if they are to his detriment and will result in self neglect. In addition, the home health aide assigned could not drive him to appointments at VA Dorn because they are outside her work zone nor could she administer medications. Elijah frequently forgets whether he took his blood pressure and heart rate medications. He also cannot use the trigger

on his maintenance pump for his COPD because of the lost of dexterity in his hands since the stroke. Also Elijah denies he has COPD and was heavily relying on his rescue pump. When the Petitioner noticed that a 30 day pump was being exhausted in 2-3 days, she called the VA Dorn Pharmacy line and Elijah was sent a maintenance pump to take once in the morning and again the evening. The Pharmacy was concerned the Elijah was getting too much of the steroid in his system. At present, Elijah requires help pushing down the maintainer pump dispenser.

**First Dump**

14. On 9 April 2025 Amanda and Darryl, another staff member, suggested Elijah go to the VA Dorn ED to see what further options were available. Elijah was repeating the same phrases or statements over and over. Elijah told the Petitioner now that the weather was warmer he could get a small heater and reside back in grandma's house. The Petitioner requested escort from HUD VASH in building 106 to the ED in the main building. At the ED, the Petitioner requested that Elijah be placed on a 30-day involuntary commitment because Elijah's conduct was erratic, agitated and Elijah wanted to return to an unsafe structure with no running water or electricity. Again Elijah's ideation or thinking process was all that was required was a small heater to reside in grandma's house since the weather was getting warmer. He seemed nebulous of the fact that there was no electricity to plug the heater into. The Petitioner asked to speak with Sheree Colvin, the Chief of Social Work at VA Dorn but she had left for the day. Elijah's case in the VA Dorn was managed by Raven.

15. On 9 April 2025, once at the VA Dorn ED, Elijah apparently changed his mind and wanted to return home and was discharged by ambulance to home. He was transported by 'Jenna' and 'Cornelia' (their supervisor was Bridgitt Cleveland). The household members were

concerned for their safety and expressed their concerns to Sumter County Sheriff's Office Staff Sergeant (Ssgt.) Bradley Hynes, but were told refusing to let Elijah reenter the household would constitute an act of self-eviction and result in arrest. Instead Ssgt Hynes suggested the Petitioner apply for involuntary commitment the next morning. Here, the Petiti Petitioner does not believe Elijah was not assessed for Alzheimer's disease or different types of dementia nor stabilized before discharge from VA Dorn ED. As a result, five days later Elijah had another episode of severe anxiety and wanted to leave the home.

**Second Dump**

16. 10 April 2025, on advice from local law enforcement, the Petitioner made an application for Involuntary Commitment with *Santee Wateree Community Mental Health Center*. The Petitioner reported aggressive thoughts and behaviors, hallucinations, sexually vulgar speech, pacing the floor all night, memory loss, claustrophobia and disingenuous speech. Elijah was picked up by local law enforcement and taken to Tuomey ED, allegedly evaluated but discharged later that evening. He arrived home about 1:30 a.m. by transport provided by the hospital. The evaluation was not a sufficient medical screening for Dementia.

17. Elijah was unstable ever since he left the VA Dorn ED Wednesday night, 9 April 2025, and the subsequent evaluation at Tuomey ED did not improve or resolve his mental health crisis. The family observed Elijah would pace the floor at night, report feeling shut in and not want doors locked at night when he returned home.

**Third Dump**

18. On 14 April 2025 Elijah had an outburst again and stated he did not want to reside at home any longer. Monday, 14 April 2025 when the Petitioner's mother went to Elijah's room, he

frantically told her "*I can't stay here; I've got to get out of here; I can hurt myself or someone at any time.*" The Petitioner and her family called 911. Elijah voluntarily left with EMS personnel in an ambulance. He was taken to Tuomey ED.

19. On 14-15 April 2025 Elijah was evaluated and admitted overnight because he showed conflicting thoughts. At the ED, Elijah was seen by Shannon LaFrance, a psychologist and ED physician's Lawrence Issacs and Renee Gettings. The next day, Tuomey ED stated Elijah was ready to discharge home. The Petitioner was in communication with Cameron, his case manager. Again, Elijah was sent home without the necessary screening for Alzheimer' disease or dementia to address his mental health crisis.

**EDs Failure to Stabilize Patient Prior to Discharge**

20. VA Dorn should not be allowed to dump Elijah at home on family members not licensed or trained to address his mental health condition nor because Elijah was not qualified for a shelter bed. VA Dorn ED had no other remedy for Elijah's emergency needs and failed to exercise ancillary services available to it. Contrary to 42 U.S.C. 1395(d)(b)(1) having no remedy for the patient he was dumped instead of placed in an facility where he could receive supervised care. The VA Dorn ED's decision to discharge Elijah even though he was not stabilized as required under 42 USC 1395dd(c )(1) is a violation of the Anti-Dumping Statute. Elijah's condition warranted transfer to an appropriate medical facility as defined in 42 U.S.C. 1395dd(c )(2) to minimize the risk to the patient and others.

21. Elijah was agitated and stated he did not want to return home on 9 April then flipped his decision. Five days later, he again was transported to Tuomey ED voluntarily for the same condition on 14 April 2025. Elijah asked Emergency Medical Services (EMS) to take him to VA Dorn ED but EMS stated they could only take him to the local hospital—Tuomey ED.

At Tuomey ED, the psychologist observed conflicting thoughts and a decision was made to keep Elijah overnight, but he was discharged the next day without a treatment plan for his ongoing mental health.

22. These hospitals should not be allowed to grossly and vagrantly violate the federal law endangering Elijah's well-being and the safety of the Petitioner and her family members. Neither the Petitioner nor her family members are trained to handle Elijah's mental health issues. The VA is working on Elijah's service connection claim but is unable to expedite an intermediate housing solution. The emergency issue is Elijah's need for supervised care, assessment and if necessary medical treatment for Alzheimer's disease or dementia. However, the VA Dept. cannot use a home health aide in the home as a psychiatric nurse or use the home environment as a suitable medical facility.

23. Therefore this complaint is for application of the civil money penalty of up to $50,000 for each violation, as allowed under 42 U.S.C. §1395dd (d) (1) of the Anti-Dumping Statute, against the VA Dorn ED and Tuomey ED and any other relief the court deems appropriate.

Respectfully submitted,

Regina M. Hunter El
3400 Hwy. 261 North
Rembert, SC 291928

25 April 2025